**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SANDRA A. HEISE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 16 C 8284** |
| | ) | |
| **CANON SOLUTIONS AMERICA, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Sandra Heise has sued her former employer, Canon Solutions America, Inc. (Canon), alleging discrimination, unequal pay, and retaliation in violation of Title VII of the Civil Rights Act of 1964 and unequal pay and retaliation in violation of federal and state equal-pay statutes. Canon has moved for summary judgment on all of Heise's claims, and Heise has cross-moved for summary judgment on her equal pay claims. For the reasons stated below, the Court grants summary judgment in favor of Canon on the retaliation claims and the Title VII termination claim but denies both sides' motions for summary judgment with respect to the state and federal Equal Pay Act and Title VII compensation claims.

## Background

The following facts are taken from the parties' Local Rule 56.1 submissions, and

they are undisputed unless otherwise noted.[1]  Heise's original employer, Ambassador

Business Solutions, became part of Canon Business Solutions after a series of

reorganizations and mergers, and Canon Business Solutions, in turn, merged with Océ

North America and Océ Imagistics (Océ) to form Canon Solutions America.  Throughout

this opinion, the Court will refer to Heise's employer as Canon.  Canon sells and

services a wide range of imaging, printing, and copying equipment.

When Canon hired Heise as a sales manager in 2000, she had already had three

years of industry experience from working in sales and marketing at Minolta.  In

February 2001, Heise was promoted from the position of sales manager to manager of

named accounts.  In January 2004, Peter Kowalczuk promoted Heise to the position of

branch sales director for the Chicago Branch.  When he promoted Heise to the branch

sales director position in 2004, Kowalczuk tapped Doug Reuter to fill Heise's former

position.  Although Heise was only making $59,000 in that role at the time of her

promotion, Kowalczuk offered Reuter a starting salary of $70,000.[2]  By comparison,

Heise's starting salary in her new role as the branch sales director was $80,000.  Heise

contends that when she found out about Reuter's offer, she complained to Kowalczuk

---

[1] In determining what is disputed, the Court focuses "not only on whether the parties profess to dispute a fact, but also on the evidence the parties offer to support their statements.  When [the Court] cite[s] as undisputed a statement of fact that a party has attempted to dispute, that reflects [a] determination that the evidence does not show that the fact is in genuine dispute."  *Zitzka v. Village of Westmont*, 743 F. Supp. 2d 887, 899 n.2 (N.D. Ill. 2010).

[2] Canon objects to this and many other statements of fact contained in Heise's Local Rule 56.1 submission as immaterial, irrelevant, and "concern[ing] events outside the applicable limitations period."  Def.'s Resp. to Pl.'s Statement of Facts (Def.'s Resp. to Pl.'s SOF) ¶ 5.  The fact that a discrete act such as this one took place outside the applicable limitations period might mean that it is not actionable, but it does not, as Canon suggests, automatically render it immaterial or irrelevant.  Prior acts may be used as background evidence in support of a timely discrimination claim.  *See Malin v. Hospira, Inc.*, 762 F.3d 552, 561 (7th Cir. 2014).

that it "would be unfair to pay [her] replacement far more than Canon ever paid [her] to do the job and only $10,000 less than it was paying [her] to run the entire branch." Pl.'s SOF, Ex. 3 (Heise Decl.) ¶ 5. Kowalczuk testified during his deposition that he did not remember Heise objecting to these salary differences. *See* Pl.'s SOF, Ex. 4 (Kowalczuk Dep.) 199:4-200:7. Kowalczuk testified that he offered Reuter the $70,000 salary because he had been with the company for over fifteen years at the time of his promotion, had a "long track record" as a "highly successful" salesperson, and was going to be taking a "heavy discount in total compensation" in his new role when the variable compensation he received as a sales representative was taken into account. *Id.* 197:23-198:5.

At the end of 2006, two years after Heise's promotion to the Chicago branch sales director position, Canon posted a newly created position for a regional director, who would oversee the downtown and suburban Chicago sales branches, which included offices in Downers Grove and Schaumburg. Heise applied for the job, but Kowalczuk chose to hire Armand Lanera instead. Kowalczuk selected Lanera for the regional director position in 2006 despite (1) having received complaints years earlier about his inappropriate behavior toward women while he was the branch sales director for the Schaumburg office[3] and (2) having placed him on a corrective action plan in May 2003 based on the Schaumburg branch's "poor performance" and concerns about

---

[3] A 2000 memorandum from Canon's human resources director at the time expressed concern that Lanera's "behavior towards women borders on harassment, and certainly is creating a hostile work environment." Pl.'s SOF, Ex. 8. Specifically, the memo stated that Lanera "leers at women, purrs and coos at them in the branch" and that "[t]his is not appropriate behavior for a senior manager in this organization, and particularly one with a documented history of sexual harassment charges." *Id.* Kowalczuk verbally reprimanded Lanera based on a recommendation from HR.

Lanera's leadership.  Pl.'s SOF, Ex. 9 at CSA00002144.  Kowalczuk testified during his deposition that he gave the position to Lanera because he had more industry experience.

Lanera clashed with Heise after his promotion to regional director.  In August 2007, Heise complained to Kowalczuk that Lanera told her he planned to demote her.  According to Heise, Kowalczuk told her she was being a "silly girl" and that Lanera would not have said such a thing.  Heise Decl. ¶ 17.  In October 2007, Lanera placed her on a corrective action plan—an action that Heise believed was unjustified.  The following month, Heise complained to HR about her problems with Lanera and her concern that Kowalczuk treated women differently from men.  In March 2008, Lanera took Heise off the corrective action plan.

In 2009, Canon began to organize its sales force by zone.  Heise's branch fell within the Central Zone.  From 2009 through 2012, the Central Zone comprised three regions:  the Chicago Region, the Southwest Region, and the Midwest Region.  As part of the 2009 restructuring, Canon created two new regional sales vice president positions within the Central Zone, one for the Midwest Region and one for the Southwest Region.  These vice presidents of sales reported to Kowalczuk, who was the vice president of sales for the entire Central Zone.  Canon hired Dan Verley as the new regional sales vice president for the Midwest Region at a starting salary of $175,000, and it hired Dusty Peck as the regional sales vice president for the Southwest Region at a starting salary of $145,000.  Canon did not post either of the openings.  Heise says that Kowalczuk told her she needed more experience as a branch sales director before she would be ready for regional management.  *See* Heise Decl. ¶ 22.

In 2010, Verley became the regional sales vice president for the Chicago Region. Once again, Canon did not post the position. Around this time, Canon reclassified the regional sales vice president positions as regional senior director of sales positions.[4] When Heise discovered that Canon had given Verley this position, she complained to Kowalczuk. Kowalczuk testified during his deposition that he understood at the time he transferred Verley to the Chicago regional management position that Heise was interested in a promotion but he did not promote her because "[s]he did not have the experience of running multiple branches" and a major account team. Kowalczuk Dep. 92:11-92:24.

Due to Verley's transfer to the Chicago Region, the senior director of sales position for the Midwest Region opened up in early 2010. Canon did not post the opening; instead, Kowalczuk promoted Mark Messner, who had been working for Canon for less than a year as the Detroit branch sales director. Kowalczuk testified that he offered the job to Messner because he had a lot of prior industry experience, had proven himself in a short time, and had deep roots in Michigan.

In July 2010, Messner resigned. Heise states that she asked Kowalczuk to tap her as Messner's replacement, just as he had tapped Messner and Verley for their regional management positions, but Kowalczuk posted the position, so she had to compete for it. Nonetheless, in September 2010, Kowalczuk selected Heise for the Midwest Region senior sales director position. On September 15, 2010, Kowalczuk sent an e-mail to Jayme Arendt, then the director of human resources for the Central Zone, asking her to forward Messner's offer letter to him. In her response, Arendt

---

[4] The Court will also refer to these positions as "regional management" positions.

stated the following:

> Messner's offer was for 140k, the original is attached.
>
> For a reference point –
>
> Peck – 150,927
> Verley – 178,461
>
> Although entirely different experience levels, which you already know.

Def.'s Statement of Facts (Def.'s SOF), Ex. W.  That same day, Kowalczuk sent an e-mail to Arendt and Canon's vice president of human resources, Nelson Remetz, with Heise's draft $140,000 offer.  He stated, "I want to be careful that the offer is in line with the other Sr Directors since Sandra would be the only woman in this role."  Def.'s SOF, Ex. X at CSA00211351.

Remetz approved the proposed $140,000 starting salary for Heise, as did Canon's president Tod Pike.  Kowalczuk offered Heise a starting salary of $140,000 and four months of guaranteed bonus income.  Heise countered by asking for $150,000 and six months' guaranteed bonus income.  Kowalczuk refused Heise's request for a higher starting salary.  In a September 28 e-mail, Kowalczuk assured Heise, "The salary is not at the minimum as you thought yesterday it is above the medium [sic] and its is [sic] a 34% increase over current which is why the offer took so long to get approved by CUSA (it is above the standard as we discussed)."  Def.'s SOF, Ex. T at CSA00300487.  On September 29, Heise accepted the final offer of $140,000 and seven months of guaranteed bonus income.  Messner's $140,000 offer, by contrast, did not include any income guarantee.

At the time Heise accepted the offer, $140,000 was the lowest salary being paid to any regional senior director of sales.  As of April 2010, the median salary for Canon's

eight regional managers was $159,548. And according to Canon's own confidential pay tables for 2009, although the minimum salary for someone in the relevant pay band (E3) was $125,300, the median salary ("midpoint" salary) was $172,055. *See* Pl.'s SOF, Ex. 25 at CSA01083310. Canon's Rule 30(b)(6) deponent, Juanita Nash-Dahlen, the HR director of employee relations and compliance, testified that the criteria the company used to set the starting salary of regional managers included: (1) job knowledge, (2) industry experience, (3) tenure with Canon, (4) product knowledge, (5) business acumen, (6) sales skill, (7) people skills, (8) prior job performance, and (9) prior salary. Both Kowalczuk and Arendt have stated that, at the time Heise was promoted to regional senior director of sales, they believed both Peck and Verley had much more experience than Heise.[5] *See* dkt. no. 134-46 (Kowalczuk Decl.) ¶ 20; dkt. no. 134-43 (Arendt. Decl.) ¶ 10.

Kowalczuk had never hired a female regional manager prior to Heise, and he has not had one since. Heise testified during her deposition that when she was promoted to the position, Kowalczuk told her that he had concerns about a single woman traveling in the marketplace and that his wife encouraged him to "give her a chance." *See* dkt. no. 134-51 (Heise Dep.) 182:16-182:20. Kowalczuk, for his part, testified that he did not recall expressing concern about women traveling alone and that he does not and did not have any such concerns. He also testified that he did not believe he told Heise that his wife told him to give her a chance.

When Heise began as senior director of sales for the Midwest Region in 2010,

---

[5] Heise disputes this characterization (and Arendt's understanding) of their relative experience levels. The Court will address the relevant regional managers' experience and other qualifications as they relate to their starting salaries as part of its analysis of Heise's equal pay claims.

the region had five branches, thirteen sales teams, and an annual sales quota of $27.9 million. The Southwest Region managed by Peck consisted of three branches and ten sales teams and had an annual quota of $25.4 million in 2010. Nonetheless, as previously mentioned, Peck was paid more than Heise. In January 2011, Heise received a salary increase of $5,000 as part of the standardization of senior director incentives, but she remained the lowest paid regional manager at Canon.

In early 2012, Heise learned from Peck that she was paid less than both Peck and Verley. Heise contends that she complained to Arendt that she thought she was being paid unfairly as the only woman in regional management. *See* Heise Decl. ¶ 41. Arendt testified during her deposition that she recalled Heise coming to her with the concern that her base salary was low. In response, Arendt testified that she "looked at [Heise's] experience, her resume, and her background," looked at the salary range, "looked at the former offer of the employee who held the same role previously, and . . . looked at her peers and their experience level." Pl.'s SOF, Ex. 75 (Arendt Dep.) 170:14-170:20. When asked why she believed Peck's higher salary was justified, Arendt stated that it was because he ran a dealership prior to joining Canon, was in a larger market, and had more years of senior director-level experience. Ultimately, Arendt told Heise that she "did not believe [Heise's] salary to be low based on her experience and time in her job." *Id.* 170:21-170:22. Arendt also testified that she spoke to Kowalczuk about Heise's concerns and her conclusion that Heise's salary was appropriate. Canon did not increase Heise's salary at that time.

In mid- to late-2012, Kowalczuk and the rest of the Canon management team began the process of restructuring the Central Zone to integrate personnel from Océ,

which Canon had recently acquired, into Canon's sales force. Ultimately, Canon reorganized the Central Zone into four regions: the Midwest Region, the Greater Chicago Region, the Southwest Region, and the Ohio Valley Region. Jim Stocker, from Océ, became the senior director of sales for the new Ohio Valley Region. Stocker's starting salary in this role was just over $133,000, which is what he had been making at Océ. As part of this reorganization, Canon shifted two branches, Milwaukee and St. Louis, into Heise's region. Milwaukee had been Verley's worst performing branch in 2012, and St. Louis had been Peck's worst performing branch in 2012. Around the same time Canon announced these changes, Kowalczuk became the national head of sales. He selected Verley to fill his former position without posting it. Steve Greiman, who was previously a vice president at Océ, took over Verley's position as senior director of sales for the Chicago region.

Heise did not receive a year-end performance review from Kowalczuk for 2012. Canon has produced a draft 2012 performance review for Heise that is labeled "Cancelled/Archived" and "Not Submitted." Pl.'s SOF, Ex. 40 at EEOC 153. This cancelled review, which appears to have been authored by Kowalczuk but is not signed, describes Heise as a "Marginal Performer" overall. *Id.* at EEOC 159. Both Peck and Verley received 2012 performance reviews from Kowalczuk; he rated Peck as a "Successful Contributor" and Verley as a "High Contributor." Pl.'s SOF, Ex. 38 at CSA00002208; Pl.'s SOF, Ex. 37 at CSA00001554. Kowalczuk gave Peck a merit increase in salary for 2012, but he did not give one to Heise.

At the beginning of 2013, Heise once again began reporting to Verley. According to Heise, from January to April 2013, Verley undermined her and treated her

disrespectfully in front of subordinates and peers.  For example, Heise alleges that Verley entered her office while she was on a conference call with her branch directors and screamed at her for using the speaker on her iPhone rather than the landline. Heise contends that Verley did not behave the same way toward the male regional managers; Canon has submitted declarations from current and former employees that say Verley treated male employees the same way.  *See* dkt. no. 134-44 (Dillon Decl.) ¶ 9; dkt. no. 134-45 (Farrow Decl.) ¶ 5.

In April 2013, Heise complained to Arendt about Verley's behavior toward her and told Arendt that she was considering taking a leave of absence.  Heise contends that she "explained in detail how Mr. Verley was harassing [her], specifically using the word harassment, and made it clear [she] believed he was treating [her] that way because [she] was a woman."  Heise Decl. ¶ 59.  She has also stated that she told Arendt she was concerned that Verley would retaliate against her and that she still did not believe she was being paid fairly in relation to the male regional managers.  Arendt testified during her deposition that although Heise complained about Verley yelling at her, she "never claimed to me hostile work environment, or harassment, or discrimination."  Arendt Dep. 163:2-163:7.  Accordingly, Arendt never told Verley or Kowalczuk that Heise had complained of discrimination or harassment.  Kowalczuk has stated that, "[o]ther than her issues with Mr. Lanera which happened years before, [he] had no knowledge that Ms. Heise had any concern or complaint about harassment or discrimination until she made such allegations after her employment had ended." Kowalczuk Decl. ¶ 31.

According to Heise, Verley's treatment of her worsened after she made the

complaint.  Based on the perceived change in Verley's behavior—and the fact that Heise believed Arendt and Verley were having an affair[6] based on statements Arendt made to her the previous fall—Heise believes that Arendt had informed Verley of her complaints.  Around August 2013, Heise confronted Verley about sharing certain information with one of her branch sales directors about potential changes to the branch without informing her first.  According to Heise, Verley angrily responded, "None of my guys act the way you do."  Heise Decl. ¶ 58.  Verley testified that he did not remember using those words, but he did remember the conversation and believed that Heise "took an unusual amount of offense" to a situation that happens frequently.  Pl.'s SOF, Ex. 15 (Verley Dep.) 229:1-231:11.

On December 27, 2013, Verley informed Heise that she was terminated, effective immediately.  She was escorted out of the building after being given an opportunity to gather her personal belongings.

Verley testified during his deposition that Canon did not terminate Heise for performance reasons.  Canon contends that after losing a substantial amount of money in 2013, the company determined that it needed to cut costs and increase profitability.  According to Canon, it made the decision to terminate Heise, along with Jim Blair, the senior director of service for the Midwest Region, as part of a restructuring of the Central Zone regions.  Specifically, Canon reduced the number of regions within the Central Zone from four to three by folding the branches that made up the Midwest Region into the remaining regions and eliminating the Midwest Region sales and service management positions.  At this time, the regional senior directors for the Central

---

[6] Both Arendt and Verley have denied this allegation.

Zone were:

- Sandra Heise (Midwest Region)

- Steve Greiman (Greater Chicago Region)

- Jim Stocker (Ohio Valley Region)

- Dusty Peck (Southwest Region)

According to Canon, the idea to collapse the Midwest Region into the other regions originated with Steven Lukaszewski, who goes by Steve Lukas. Lukas was the vice president of service for the Central Zone (Verley's counterpart) during this time. After Lukas discussed the idea with Verley and Arendt, Lukas and Verley raised the idea with their respective bosses, Kowalczuk and Art McGinn, Canon's national head of service. As early as September 20, 2013, Arendt was considering the cost of severance for Heise and Blair if their positions were eliminated as part of the collapse of the Midwest Region into the remaining regions. *See* Pl.'s SOF, Ex. 50 (HR e-mail contemplating severance costs for Heise and Blair).

On October 9, 2013, Kowalczuk sent an e-mail to Lukas and Verley entitled "Central Zone Proposed Regions." Pl.'s SOF, Ex. 56. The e-mail stated "I would like to confirm we are all on the same page as it pertains to the three regions in Central. Leadership TBD." *Id.* As Canon later explained in its response to Heise's EEOC charge, the Chicago and Southwest Regions were not candidates for consolidation because the Chicago Region was too large to be managed from any other market, and certain branches in the Southwest Region were located in Texas and Oklahoma—"far from the more northern cities that make up the rest of the zone." Pl.'s SOF, Ex. 39 at EEOC 116.

Canon ultimately made the decision to break up the Midwest Region, terminate Heise and Blair, and consolidate the region's branches into the Chicago and Ohio Valley Regions for 2014.[7]  The Ohio Valley Region was renamed the Great Lakes Region.

At Kowalczuk's request, Human Resources conducted a review of Heise's proposed termination before it was finalized.  In a November 1, 2013 e-mail to Kowalczuk entitled "Re: Fw: Job Eliminations at year end 2013," Verley stated the following regarding HR's review:

> Sandra as you know will be part of the dissolution of the Midwest.  While the sales results are playing out as expected I did verify with Jayme if for some reason she was above one of her peers come year end the fact that Midwest is being closed, Jim is being let go as well, and all of the past issues with her abilities and lack of leadership would be more than enough to justify it being her so we are safe either way.

Def.'s SOF, Ex. EE.  Canon did not give Heise or Blair prior notice of their terminations, nor did it attempt to place either of them in another role at the company.

Heise filed a charge of discrimination with the Equal Employment Opportunity Commission on July 30, 2014, alleging sex discrimination in violation of Title VII and the Equal Pay Act and retaliation.  In October 2015, the EEOC issued a two-page reasonable cause determination.  The EEOC found reasonable cause to believe that Canon (1) subjected Heise to different terms and conditions of employment based on her sex by denying her a pay increase and performance review in violation of Title VII and (2) discharged Heise in retaliation for engaging in protected activity, in violation of Title VII and the Equal Pay Act.  *See* Pl.'s Reply in Supp. of Cross-Mot. for Summ. J.,

---

[7] Heise contends that Canon's explanations of how it came to eliminate the Midwest Region (and thus to terminate Heise) have not been consistent, apparently because Canon has not always credited Lukas with the idea and because Canon has suggested at times that management also considered eliminating the Ohio Valley Region.  *See, e.g.*, Pl.'s SOF, Ex. 39 at EEOC 116.

Ex. 92.  The EEOC did not explain the evidentiary basis for these findings.  The parties

subsequently entered into a Standstill Agreement that tolled the applicable statutes of

limitations from November 25, 2015 through August 26, 2016.  Heise filed the present

suit against Canon on August 23, 2016.  Heise asserts the following claims in her

second amended complaint:

> 1. Unequal compensation in violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1);

> 2. Unequal compensation in violation of the Illinois Equal Pay Act of 2003, 820 ILCS 112/10(a);

> 3. Retaliation in violation of the Equal Pay Act;

> 4. Retaliation in violation of the Illinois Equal Pay Act;

> 5. Sex discrimination (unequal compensation and termination) in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1); and

> 6.  Retaliation in violation of Title VII.

2d Am. Compl. at 11-14.

**Discussion**

Canon has moved for summary judgment on all of Heise's claims.  Canon

contends that summary judgment is warranted on the retaliation claims (counts 3, 4,

and 6), all of which are based on Heise's termination, because the undisputed evidence

shows that her position was eliminated as part of a legitimate restructuring designed to

cut costs.  To the extent that Heise's Title VII discrimination claim (count 5) is based on

her termination, Canon argues that summary judgment is warranted on that claim for

the same reason.  Canon argues that the retaliation claims also fail for the additional

reason that Heise did not engage in any protected activity.  Canon contends that the

Court should likewise grant summary judgment on Heise's equal pay claims (counts 1

and 2) for the following reasons: (1) Heise was paid the same starting salary as senior director of sales for the Midwest Region as her immediate male predecessor Messner; (2) Heise received a raise three months into the position, at which point her salary was higher than Messner's had ever been; (3) Heise was paid more than Stocker, the senior director of sales for the Ohio Valley Region; (4) Verley and Peck had substantially greater responsibilities because their regions were larger and had higher sales goals; and (5) Verley's and Peck's higher salaries were based on factors other than sex, including their greater managerial experience and qualifications.[8] Lastly, Canon argues that any federal Equal Pay Act claim based on events that took place prior to November 22, 2013 is time-barred pursuant to the statute's two-year statute of limitations for non-willful violations of the Act.[9]

Heise contends that she has adduced sufficient evidence to preclude summary judgment on her retaliation and Title VII discriminatory discharge and equal pay claims. She has cross-moved for summary judgment on her federal and state Equal Pay Act

---

[8] Canon also argued in its opening brief that Heise's Title VII sexual harassment / hostile environment claim fails as a matter of law, but Heise clarified in her response brief that she is no longer pursuing any such claim. *See* Pl.'s Resp. and Cross-Mot. for Summ. J. (Pl.'s Resp.) at 14 n.14 ("Canon moved for summary judgment on Heise's sexual harassment / hostile environment claim. However, Heise is not pursuing that claim under [her] Second Amended Complaint."). Canon further argued that, to the extent Heise seeks to pursue a Title VII discrimination claim based on allegedly discriminatory acts aside from her termination and unequal pay, summary judgment is warranted on the ground that the other acts do not constitute materially adverse employment actions. Heise has forfeited this point by failing to respond to it. *See, e.g.*, *Potts v. Manos*, No. 11 C 3952, 2017 WL 4340157, at *4 (N.D. Ill. Sept. 29, 2017). In any case, Heise does not appear to assert a Title VII discrimination claim based on anything other than her "discriminatory discharge" and the unequal pay allegations. *See* Pl.'s Resp. at 3, 19.

[9] Canon also contends that any Title VII claim based on conduct that occurred before October 2, 2013 is time-barred, but Heise has specifically stated that she does not seek to bring claims for any conduct that falls outside the relevant limitations period. *See* 2d Am. Compl. at 13 n.3.

claims.[10]  Heise argues that there is no genuine dispute that she has established a prima facie case under the relevant equal-pay statutes because she has shown she was paid less than Peck and Verley, whom she contends performed equal work requiring equal skill, effort, and responsibility.  Heise further argues that a reasonable jury could not find that the pay disparity was due to gender-neutral factors.

When reviewing cross-motions for summary judgment, the Court takes the motions one at a time, construing all facts and drawing all reasonable inferences in favor of the non-moving party.  *Steimel v. Wernert*, 823 F.3d 902, 910 (7th Cir. 2016). Summary judgment is appropriate only if the movant shows that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "[I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is unwarranted.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Courts must be cautious in applying the summary judgment standard to employment discrimination cases, because such cases often turn on intent and credibility issues.  *See Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).  Nonetheless, "the mere existence of *some* alleged factual dispute between the parties" is insufficient to defeat a motion for summary judgment.  *Id.* (emphasis in original) (quoting *Anderson*, 477 U.S. at 247).

---

[10] Although Heise initially moved for summary judgment on her Title VII compensation claim, the Court finds that Heise has abandoned her motion for summary judgment on that claim because in her reply brief, she argues only that "[d]isputed facts preclude summary judgment" on it.  Pl.'s Reply at 10; *see also id.* at 2 ("Canon violated the Illinois and federal Equal Pay Acts as a matter of law and has submitted evidence to support a Title VII pay claim.").  In any event, a grant of summary judgment in favor of Heise on her Title VII unequal pay claim would not be warranted on this record.

## A.    Title VII—discriminatory discharge (claim 5)

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against employees based on race, color, religion, sex, or national origin.  *See* 42 U.S.C. § 2000e-2(a).  To survive a motion for summary judgment on a Title VII discrimination claim, the plaintiff must produce sufficient evidence to "permit a reasonable factfinder to conclude that [her] race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action."  *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  In making this determination, the Court must consider the evidence as a whole.  *Id.*

Canon has moved for summary judgment on Heise's Title VII discriminatory discharge claim.  Canon contends that no reasonable factfinder could conclude that Heise was terminated because of her sex because the undisputed evidence shows that she was terminated, along with her counterpart on the service side, when Canon consolidated regions in the Central Zone to cut costs.  Heise argues in response that she has provided ample evidence from which a reasonable jury could conclude that the restructuring decision was pretextual and that she was actually terminated because of her sex.

Heise points to the November 1, 2013 e-mail from Verley to Kowalczuk as evidence that they "first decided to terminate Heise's employment, and *then* identified the reasons that could 'justify' that decision and keep them 'safe.'"  Pl.'s Resp. at 4-5 (emphasis in original).  Heise suggests that the reference in the e-mail to sales numbers playing out as expected is evidence that the 2012 decision to shift the worst-performing branches from Verley's and Peck's regions to Heise's region "was no accident, but

instead a deliberate attempt to ensure her sales numbers would tank," thereby justifying her termination. *Id.* at 5.

Although the November 1 e-mail did reference regional sales results and other aspects of Heise's performance—both factors that Canon says played no role in the decision to terminate Heise—it prefaces that discussion with the following sentence: "Sandra as you know will be part of the dissolution of the Midwest." Def.'s SOF, Ex. EE. For that reason, Canon contends that the e-mail is in no way inconsistent with the explanation that Heise was terminated due to restructuring. Canon further argues that even though the ultimate decision to terminate Heise had nothing to do with sales numbers or Heise's performance and everything to do with the decision to eliminate the Midwest Region, it made sense for HR to consider performance factors in evaluating Heise's proposed termination.

Because it is Canon who has moved for summary judgment on Heise's Title VII discriminatory discharge claim, the Court views the evidence in the light most favorable to Heise and draws all reasonable inferences in her favor. Nonetheless, the sentence immediately preceding the reference to Heise's sales results in the November 1 e-mail unequivocally states that Heise "will be part of the dissolution of the Midwest." *Id.* It would not be reasonable for a factfinder to infer from that e-mail that Heise's termination was not the result of a legitimate restructuring but instead, as Heise claims, that Verley and Kowalczuk were searching for various pretexts—including poor performance— under which they could fire her.

Heise additionally argues that a reasonable jury could find Canon's given reason for her termination pretextual because Canon, Kowalczuk, Verley, and Arendt have not

consistently described the decision-making process that resulted in her termination.  For example, Canon suggested in an August 2014 EEOC filing and in its answers to Heise's interrogatories that although both the Midwest Region and the Ohio Valley Region were "potential options" for consolidation, it ultimately selected the Midwest Region and terminated its regional management accordingly.  Pl.'s SOF, Ex. 39 at EEOC 116; Pl.'s SOF, Ex. 49 at 14.  According to Heise, those statements contradict Canon's current representation that it did not consider terminating the employment of any other regional senior director of sales "[b]ecause it was the Midwest Region that was being eliminated."  Def.'s SOF ¶ 59.  Heise also argues that Verley's deposition testimony that Heise was terminated because "[t]he decision was made to eliminate two of the regions in the US and that [her] role would no longer be needed" conflicts with his later testimony that the original idea to collapse the Midwest Region into the other regions came from Lukas.  Verley Dep. 279:15-280:12.  Heise suggests that it is implausible that Lukas conceived of this idea because he worked on the service side of the business and Canon did not initially list him as being involved in the decision to eliminate the Midwest Region and terminate Heise.

As a preliminary matter, Heise appears to be conflating the issue of how the decision to consolidate the Midwest Region and terminate its leadership was made and who was involved in that decision-making with the issue of who first proposed the idea and why.  Assuming that these and all the other related "inconsistencies" identified by Heise are actually inconsistencies—a proposition that the Court seriously doubts—they are so minor as to be immaterial.  *See, e.g.*, *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003) ("Shifting and inconsistent explanations can provide a basis for

a finding of pretext . . . [b]ut the explanations must *actually* be shifting and inconsistent to permit an inference of mendacity.") (emphasis added). Even when the evidence is viewed in the light most favorable to Heise, no reasonable jury could conclude from this record that Canon has materially changed its story regarding why it decided to eliminate the Midwest Region and, along with it, Heise's regional management position.

Heise additionally suggests that a reasonable jury could infer that Canon could have terminated any one of the other regional managers besides Heise during this restructuring, and that the decision to terminate Heise in particular was discriminatory in light of the fact that she had better sales numbers than both Greiman and Stocker. She further argues that a jury could infer pretext from the absence of contemporaneous documentary evidence regarding the need to cut costs in the Central Zone and the fact that Canon created a new branch sales director position in Cincinnati around the same time it made the decision to eliminate the Midwest Region. These arguments fail because, as the Seventh Circuit has explained many times, in determining whether an employer's given reason for an employment decision is pretextual, the factfinder's role "is not to inquire into the wisdom of [the] decision, but simply to determine if 'the employer is dissembling to cover up a discriminatory [or retaliatory] purpose.'" *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 229 (7th Cir. 2017) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)); *see also Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016) ("[W]hen assessing a plaintiff's claim that an employer's explanation is pretextual, we do not second-guess an employer's facially legitimate business decisions.") (alterations, internal quotation marks, and citation omitted).

Heise also contends that she has presented sufficient circumstantial evidence of gender-based animus from which a reasonable jury could infer that she was actually terminated due to sex discrimination. Specifically, she points to the fact that Kowalczuk once called her a "silly girl" and notes that he expressed concern about a woman traveling alone. Heise Decl. ¶ 17; *see* Heise Dep. 182:16-182:20. As additional evidence of Kowalczuk's animus toward women, Heise cites, among other things: (1) his decision to promote Lanera despite his documented history of sexual harassment, (2) his decision to transfer Verley's and Peck's worst-performing branches to her region in 2012, (3) his decision to deny her a merit increase in 2012, (4) numerous instances in which Kowalczuk passed her over for promotions and paid her less than her male colleagues, and (5) several instances in which Kowalczuk accommodated men whose jobs were in jeopardy either by finding them another position within the company or giving them advance notice of their termination. With respect to Verley, Heise contends that (1) he only hired and promoted men into upper management, (2) he had a hand in firing the only two female direct reports he inherited, (3) he harassed Heise but not her male peers, and (4) he told Heise "None of my guys act the way you do."[11] Heise Dep. 208:1-208:2.

A reasonable factfinder, drawing all inferences in Heise's favor, could very well infer that the background evidence cited by Heise is indicative of gender-based animus.

---

[11] Heise also contends that Verley told Heise's subordinate Jeff Priest that she was being set up to be fired and would be fired shortly. The only evidence Heise cites for this contention, however, is inadmissible hearsay. *See* Pl.'s SOF, Ex. 21 ¶ 7 ("Mike Eakle told me that Jeff Priest told him that Sandra's firing was a 'setup' . . . . Priest said to me specifically, bide your time, she won't be here long, there is a plan to get her out by the end of the year"). Priest himself has denied having any advance notice of the restructuring or of Heise's termination. *See* dkt. no. 134-48 (Priest Decl.) ¶ 16.

But the operative question with respect to Heise's discriminatory discharge claim is whether she has produced enough evidence to permit a reasonable factfinder to conclude that her sex was what caused her termination. *See Ortiz*, 834 F.3d at 765. The Court concludes that she has not. Even when the evidence is viewed in the light most favorable to Heise, a reasonable jury simply could not conclude on this record that Canon's explanation for Heise's termination was pretextual or, more generally, that Heise's sex was the real reason for her termination. The Court therefore grants Canon's motion for summary judgment on Heise's Title VII discriminatory discharge claim.

## B.     Retaliation (claims 3, 4, and 6)

To survive summary judgment on a Title VII or Equal Pay Act retaliation claim, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there is a but-for causal connection between the protected activity and the materially adverse action. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013); *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017); *Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001) (applying same standard to Title VII and Equal Pay Act retaliation claims).

Although Canon does not dispute that Heise's termination was an adverse employment action, it argues that no reasonable jury could find that Heise's complaints to Arendt about her pay and Verley's treatment of her constituted protected activities because the complaints did not indicate that they were related to Heise's sex. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) ("Merely

complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.").

It is true that Arendt testified during her deposition that she did not understand Heise's complaint about Verley yelling at her to be a "hostile work environment, or harassment, or discrimination" complaint. Arendt Dep. 163:2-163:7. Arendt also characterized Heise's prior 2012 complaint about her pay as merely a concern that her base salary was low, rather than a concern that she was being paid less than the other regional senior directors of sales because of her sex. *See id.* at 169:1-170:5. But Heise has specifically stated that she told Arendt she thought she was "being paid unfairly as the only woman in the group." Heise Decl. ¶ 41. And with respect to her April 2013 complaint about Verley, Heise contends that when she met with Arendt, she "specifically us[ed] the word harassment, and made it clear [she] believed he was treating [her] that way because [she] was a woman." *Id.* ¶ 59. She also says that she again raised her concern that she was not being paid fairly compared to the male regional managers. *Id.* A reasonable factfinder could choose to believe Heise over Arendt with respect to the content of her complaints. Summary judgment is thus unwarranted on this basis.[12]

Canon also argues that Heise has not produced evidence from which a reasonable jury could infer a causal link between her complaints and her termination. Canon first contends that there can be no such link because Verley and Kowalczuk, the decision-makers responsible for her termination, had no knowledge that Heise engaged

[12] Because the Court concludes that a genuine factual dispute exists regarding whether Heise engaged in protected conduct, it does not address Heise's spoliation argument regarding Canon's failure to preserve Arendt's e-mails, which Heise alleges might have contained information pertaining to her complaints.

23

in protected activity; Arendt testified that she never communicated to Verley or Kowalczuk that Heise complained of discrimination or harassment. As Heise points out, however, Arendt did describe Heise's complaints as "concerns of harassment" during an earlier part of her deposition. Arendt Dep. 151:24-152:1. In any event, although Arendt may not have characterized Heise's concern about her pay as a discrimination complaint, the record shows that Arendt did evaluate Heise's salary as compared to the other male senior directors of sales, and she did speak to Kowalczuk about Heise's concern. That same year, Kowalczuk transferred two historically underperforming branches to Heise's region. Heise has also asserted that after she complained to Arendt about Verley in April 2013, Verley's treatment of her took a turn for the worse. Arendt testified that she spoke directly to Verley after Heise's complained about his behavior. *See* Arendt Dep. 165:3-165:4. According to Heise, after she complained to Arendt about him, Verley began blocking decisions she attempted to make within her region and "would avoid talking to [her] at all when he could." Heise Decl. ¶ 60. In August 2013, Verley told her, "None of my guys act the way you do." Heise Dep. 208:1-208:2. Viewing the evidence in the light most favorable to Heise, a reasonable jury could infer that Kowalczuk and Verley did, in fact, know about Heise's complaints. *See Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994) ("A Title VII plaintiff may rely on circumstantial evidence to establish her employer's awareness of protected expression.").

Canon next argues that Heise has nonetheless failed to show a genuine factual dispute regarding whether she was terminated because of any protected activity, for essentially the same reasons that no reasonable factfinder could conclude she was

terminated because of her sex. Specifically, Canon contends that the undisputed evidence shows that Heise was terminated along with the male senior director of service for the region, Jim Blair, as the result of a legitimate restructuring decision designed to cut costs. In support of this argument, Canon contends that the significant gap in time between when Heise made her last complaint to Arendt (April 2013) and her December 2013 termination weighs heavily against finding a causal link between the two events. Canon argues that Heise's causation argument is further undercut by the fact that Lukas—the person Canon contends originally conceived of the idea to eliminate the Midwest Region—had no connection to Heise and would not have had any motive to retaliate against her.

Heise argues that a reasonable jury could infer from Verley's November 1, 2013 e-mail to Kowalczuk that they planned to fire her in retaliation for complaining about unequal pay and harassment. As previously noted, Heise has suggested that the reference to sales numbers playing out as expected is evidence that the 2012 decision to shift the worst-performing branches from Verley's and Peck's regions to Heise's region was a deliberate decision to sabotage her sales numbers and justify her termination. Heise further suggests that Verley's reference to being "safe either way" indicates he was aware of Heise's protected activity and the possibility that she might bring a claim against Canon. Def.'s SOF, Ex. EE.

Again, because it is Canon who has moved for summary judgment on the retaliation claims, the Court must view the evidence in the light most favorable to Heise. A reasonable factfinder could infer from the e-mail, as Heise suggests, that Verley and Kowalczuk were aware that Heise engaged in protected activity and were concerned

she might make a discrimination or retaliation claim. But that does not necessarily mean that a reasonable jury could find that Heise's termination was motivated by retaliation rather than a legitimate restructuring decision.

Over the years that Heise worked for Canon, the company restructured its sales force on several occasions. Canon's 2012 decision to shift the poorly-performing Milwaukee and St. Louis branches to Heise's region was part of a larger reorganization of the Central Zone that followed its acquisition of Océ. Additionally, as previously noted, Canon has consistently explained that Heise was terminated as part of its decision to consolidate the regions in the Central Zone from four to three, and Heise has not presented evidence from which a reasonable jury could conclude that this explanation is pretextual. *See supra* Part A.

As was the case with respect to Heise's discriminatory discharge claim, on this record, even when all reasonable inferences are drawn in favor of Heise, a reasonable jury simply could not find a causal connection between Heise's discrimination and harassment complaints and her termination. The Court therefore grants Canon's motion for summary judgment on Heise's retaliation claims.[13]

## C.   Equal Pay Act violations (claims 1 and 2)

"The Equal Pay Act forbids employers from paying different rates to men and women for the same work at the same establishment." *David*, 846 F.3d at 230 (citation

---

[13] The Court overrules Heise's argument that it should not grant Canon's motion for summary judgment on the retaliation claims because Arendt, Verley, and Kowalczuk are biased witnesses. Summary judgment is warranted because Heise has not met her burden to put forward sufficient evidence to support a finding of retaliation. *See, e.g.*, *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

omitted).  To prove a violation of the Equal Pay Act,[14] Heise must first establish a prima facie case of unequal pay by showing that 1) she was paid less than a male employee, 2) for equal work requiring substantially similar skill, effort, and responsibilities, and 3) they performed the work under similar working conditions.  *Id.*; *see also* 29 U.S.C. § 206(d)(1).  In determining whether two jobs are equal, courts "look to whether the jobs have a common core of tasks, i.e., whether a significant portion of the two jobs is identical.  Once a plaintiff establishes a common core of tasks, we ask whether any additional tasks make the jobs substantially different."  *Id.* (internal quotation marks and citation omitted).  This determination must be based on the actual job duties performed by each employee, rather than job description or title.  *See Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 695 (7th Cir. 2006).

If Heise can establish a prima facie case, the burden shifts to Canon to show that the pay disparity at issue was justified by one of the following:  1) a seniority system, 2) a merit system, 3) a system that measures earnings by quantity or quality of production, or 4) any factor other than sex.  29 U.S.C. § 206(d)(1); *see Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 793-94 (7th Cir. 2007).  "An employer asserting that the difference is the result of a 'factor other than sex' must present this contention as an affirmative defense—and the proponent of an affirmative defense has the burdens of both production and persuasion."  *King v. Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 474 (7th Cir. 2012).

Canon first contends that Heise cannot make out a prima facie case of unequal

---

[14] The parties do not dispute that the same substantive standards apply under the Illinois Equal Pay Act, 820 ILCS 112/10(a).  *See, e.g.*, *Bowbin v. Bulkmatic Transp., Inc.*, No. 07 C 260, 2007 WL 3374402, at *5 n.2 (N.D. Ill. Nov. 13, 2007).

pay because she cannot show that she was paid less than any male colleague who performed equal work. Canon argues that the most direct and appropriate comparator is her immediate predecessor as senior director of sales for the Midwest Region: Mark Messner. Canon offered Messner the same starting salary ($140,000) that it offered Heise to do the same job less than a year later. Heise contends, however, that Messner is not the only male colleague with whom she may compare herself for Equal Pay Act purposes. According to Heise, Verley and Peck, the male senior directors of sales for the Southwest and Greater Chicago Regions, also performed equal work requiring substantially similar skill, effort, and responsibilities, but were paid significantly more than she (Verley's 2009 starting salary was $175,000 and Peck's 2009 starting salary was $145,000). Heise contends that Doug Reuter, who became the senior director of sales for the Chicago Region in 2014, was also paid more than she for performing equal work.

Canon argues that Heise cannot show that she had the same level of responsibility as Verley, Peck, or Reuter because it is undisputed that they managed more employees, were responsible for larger metropolitan areas, and had much higher sales quotas than Heise did as the senior director of sales for the Midwest Region. Canon suggests that, after Messner, senior director of sales for the Ohio Valley Region Jim Stocker is the most appropriate comparator, because that region was the most comparable to the Midwest Region in terms of size and sales quotas in 2013. Canon contends that Heise's equal pay claims fail for the additional reason that Stocker's 2013 salary was nearly $15,000 less than Heise's salary for that year. Heise has cross-moved for summary judgment on her equal pay claims.

As an initial matter, Heise is not limited to her immediate predecessor as a comparator. The male senior sales directors for the other regions within the Central Zone are also appropriate comparators if Heise is able to show that they actually performed equal work requiring substantially similar skill, effort, and responsibilities. Nothing in *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333 (7th Cir. 1993), the case Canon cites for the proposition that Messner is Heise's most "appropriate" comparator, suggests otherwise. Def.'s Mem. in Supp. of Mot. for Summ. J. at 9. In that case, the Seventh Circuit denied the plaintiff's Equal Pay Act claim not simply because the defendant paid her the same starting salary as her predecessor, but because the plaintiff failed to point to any other male comparator who actually received higher pay for performing equal work. *See Weiss*, 990 F.2d at 338. Additionally, the fact that Heise was paid more than Stocker in 2013 is of little relevance because, as Heise points out, Stocker's starting salary for the senior director of sales position appears to have been set by Océ prior to its integration with Canon; Canon simply honored the salary Stocker was being paid prior to the merger. *See* Pl.'s SOF, Ex. 26 (30(b)(6) Dep.) 80:2-80:8; Kowalczuk Dep. 119:20-120:12.

In *Sims-Fingers v. City of Indianapolis*, 493 F.3d 768 (7th Cir. 2007), the Seventh Circuit concluded that the plaintiff, a manager of one of the parks owned by a city park system, failed to make a prima facie case of unequal pay for equal work because her higher-paid male counterparts ran different parks, the management of which required greater skill, effort, and responsibility. *Id.* at 770-72. Similarly, in *Cullen v. Indiana University Board of Trustees*, 338 F.3d 693 (7th Cir. 2003), the Seventh Circuit concluded that two university program director positions did not have equal levels of

responsibility where one of the directors managed a department that was twice the size of the other and that director's program generated more than six times the tuition revenue generated by the other program. *Id.* at 700. Canon contends that the present case is analogous to *Sims-Fingers* and *Cullen* based on the following differences between regions as of July 2013:

| Region | Areas Covered | Number of Employees | Annual Sales Quota |
|---|---|---|---|
| Chicago | Greater Chicago Area, including offices in Chicago, Downers Grove, Schaumburg, plus Major Accounts group | 60 | $42,397,000 |
| Southwest | Dallas, Houston, Austin, Ft. Worth, San Antonio, Oklahoma City | 63 | $27,400,000 |
| Midwest | Detroit, Grand Rapids, Lansing, Milwaukee, Minneapolis, St. Louis | 41 | $19,250,000 |
| Ohio Valley | Cincinnati, Cleveland, Columbus, Dayton, Lexington, Louisville, Pittsburgh | 55 | $19,641,000 |

Def.'s SOF ¶ 5.

Heise contends that she, Verley, and Peck performed equal work requiring substantially similar skill, effort, and responsibilities because, as senior directors of sales, they performed an identical set of tasks. In support of this contention, Heise has submitted a declaration by former Canon senior director of sales for the Pacific Region, Dusty Lininger, who asserts that the regional manager positions at Canon were standardized because each regional manager did "the same thing – supported and drove sales in the branches – just in different geographical regions." Pl.'s SOF, Ex. 55 ¶ 6. According to Lininger, it was actually more challenging to manage a region without a flagship branch in a big city like Chicago or Los Angeles because such flagship

branches tend to have a large base of existing customers that provide a steady stream of revenue; regions lacking a flagship branch must rely on smaller customers and try to bring in more new business, which is more challenging than retaining existing customers. *Id.* Canon contends that this evidence is inadmissible on the ground that it is speculative and lacks foundation because Lininger only worked as a senior director of sales for a single region. The Court disagrees. Lininger's three years of experience as a regional manager within the company provide more than enough foundation for him to testify on the subject. The fact that he only ever managed one region may affect the weight a jury gives to his testimony, but it does not make his testimony inadmissible.

Additionally, according to Heise, Canon's argument that it takes greater responsibility and effort (and thus merits a higher salary) to manage a larger region that includes bigger cities and has a higher sales quota is undermined by the fact that Canon paid Heise less than Peck in 2010, when the Midwest Region was larger and had a higher sales quota than the Southwest Region. As Heise points out, Canon has not identified region size, the number of direct reports, or sales quota size as factors considered with respect to regional managers' starting salaries. Although it is not Canon's burden at this stage to prove otherwise, the fact that it apparently did not rely on any of those factors when setting salaries tends to undercut its assertion that such factors appreciably increase a senior director's job responsibilities. A reasonable factfinder could expect that the company would account for different levels of required effort and responsibility in setting starting salaries.

Viewing the evidence in the light most favorable to Heise and drawing all reasonable inferences in her favor, a reasonable factfinder could conclude that Heise's,

Verley's, and Peck's senior director of sales positions all required substantially similar skill, effort, and responsibilities, notwithstanding the differences in the numbers of direct reports and region and quota size. On the other hand, a reasonable factfinder viewing the evidence in the light most favorable to Canon could conclude that those differences do appreciably increase the overall responsibilities of the Chicago and Southwest regional managers such that they cannot be said to perform equal work compared to a senior director of sales for the Midwest Region. Thus neither side is entitled to summary judgment on the issue of whether Verley and Peck performed work equal to Heise.

Canon additionally argues that even if Heise can establish a prima facie case of unequal pay, summary judgment is warranted on her equal pay claims because all the relevant salary decisions were based on factors other than sex, and no reasonable jury could conclude otherwise. As previously noted, Canon has asserted that the sex-neutral factors it used to set the relevant senior director of sales salaries were: (1) job knowledge, (2) industry experience, (3) tenure with Canon, (4) product knowledge, (5) business acumen, (6) sales skill, (7) people skills, (8) prior job performance, and (9) prior salary. Canon contends that Verley, Peck, and Reuter all had greater experience in sales management prior to being hired into their senior director of sales roles. Canon further notes that it set both Verley's and Peck's starting salaries at a time when the position was classified as a higher regional vice president position and that it simply did not reduce their salaries when it reclassified their positions around July 2010. Canon additionally asserts that Heise's comparison to Reuter is flawed because Canon set Reuter's regional management starting salary years after it set Heise's, by which point

the minimum salary for such a position had increased nearly $10,000. *See* Pl.'s SOF, Ex. 25 (minimum regional manager salary was $125,300 in 2009, but $133,370 in 2014). Heise has cross-moved for summary judgment on the basis that the undisputed evidence shows Canon did not actually apply the neutral criteria it identifies when setting her starting salary.

The Court agrees with Canon that the comparison to Reuter is problematic due to the significant gap in time between their respective promotions and the intervening changes to Canon's minimum salary for the position. The Court is not persuaded, however, that the fact that Peck and Verley were initially given regional vice president titles has any bearing on their starting salaries. As Heise notes, regardless of title, Canon has consistently paid regional managers a starting salary within the same E3 pay band.

Experience level is the factor Canon most cites to explain the discrepancies in starting salary between Heise and her male counterparts. At the time she was promoted to the senior director of sales position, Heise had thirteen years of experience in the industry. It is undisputed that Verley and Reuter had significantly more industry experience than Heise when they were either hired or promoted into their regional manager roles. But although Kowalczuk and Arendt have stated that they believed Peck had "much more" extensive experience than Heise, Peck actually had just eight years of prior sales management experience in the industry and two years of experience managing a team that sold financing in the industry. Arendt Decl. ¶ 10; Kowalczuk Decl. ¶ 20. Heise, despite having more years of industry experience, was offered a starting salary that was $5,000 less than Peck's. Heise also had a longer

tenure at Canon (ten years vs. none) and a higher previous salary ($104,791 vs. $100,000). Kowalczuk has explained that Peck's prior experience as a regional vice president at another company within the industry entailed managing multiple offices, experience that Heise did not have. As Heise notes, however, Kowalczuk has admitted that he did no independent analysis of Heise's offer, nor did he know what criteria HR used to come up with the $140,000 figure. And although Arendt testified that Peck had valuable experience running a dealership within the industry, Peck himself testified during his deposition that although he had plans to buy a dealership, he never actually did. Additionally, Arendt has testified that she did not know what Heise's work experience was prior to joining Canon. On this record, a reasonable factfinder could conclude that Canon did not rely on its stated sex-neutral factors in deciding to offer Heise a starting salary that was $5,000 lower than Peck's. On the other hand, in light of Kowalczuk's and Arendt's testimony about perceived differences between Heise's and Peck's prior experience, a reasonable factfinder could also conclude that Canon did, in fact, use sex-neutral criteria in setting Heise's salary relative to that of Peck and the other regional managers.

Accordingly, genuine issues of material fact regarding Heise's ability to make out a prima facie case of unequal pay and Canon's actual reliance on sex-neutral factors in setting the starting salaries of regional managers preclude a grant of summary judgment for either side on Heise's federal and state Equal Pay Act claims.

The Court must address one final point regarding the Equal Pay Act claims: the relevant statute of limitations. Canon contends that a two-year statute of limitations applies to Heise's federal Equal Pay Act claim because she cannot show that any

violation of the Act was "willful," which would extend the statute of limitations period an additional year. *See* 29 U.S.C. § 255(a). A violation of the Equal Pay Act is willful if the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988); *EEOC v. Madison Cmty. Unit Sch. Dist. No. 12*, 818 F.2d 577, 585 (7th Cir. 1987). Viewing the evidence in the light most favorable to Heise, a reasonable jury could infer that Kowalczuk either knew Canon was violating the Equal Pay Act or showed reckless disregard for that fact based on his false assertion in his September 2010 e-mail to Heise that the starting salary offer of $140,000 was "above the medium [sic]." Def.'s SOF, Ex. T at CSA00300487. At the time Kowalczuk made that statement, he would have known both Peck's and Verley's salaries were significantly higher than that. *See* Def.'s SOF, Ex. W. The fact that Canon offered Heise the same starting salary Messner was offered and the fact that Kowalczuk specifically stated that he wanted to be careful that Heise's offer was "in line" with that of the other senior directors because Heise would be the only woman in that role do not preclude a finding of willfulness. Def.'s SOF, Ex. X at CSA00211351. The Court therefore overrules Canon's argument that a two-year statute of limitations, rather than a three-year statute of limitations, applies to Heise's federal Equal Pay Act claim as a matter of law.[15]

**D.    Title VII discrimination—unequal compensation (claim 5)**

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). A successful affirmative defense to an Equal Pay Act claim

---

[15] The Illinois Equal Pay Act provides for a five-year statute of limitations. *See* 820 ILCS 112/30(a).

will likewise serve as a valid defense to an unequal pay claim brought under Title VII. *Fallon v. State of Illinois*, 882 F.2d 1206, 1213 (7th Cir. 1989). Unlike the Equal Pay Act, however, Title VII requires a showing of discriminatory intent. *See Cullen*, 338 F.3d at 703 n. 8.

Canon contends that it is entitled to summary judgment on Heise's Title VII unequal pay claim. The Court has already rejected one of Canon's arguments, which is that the disparities in pay between Heise and her male counterparts were based on sex-neutral factors and no reasonable jury could conclude otherwise. *See supra* Part C. Canon also argues, however, that summary judgment is warranted on two other grounds: (1) Heise was not similarly situated to Peck or Verley because different decision-makers set their starting salaries and (2) Heise has not presented evidence that Canon acted with discriminatory intent in setting her salary.

In response to Canon's first argument, Heise contends that she is in fact similarly situated to Peck and Verley for purposes of her Title VII unequal pay claim because even though Kowalczuk and Arendt were not personally involved in setting Peck's and Verley's starting salaries as regional managers, Canon has asserted that it considered the same sex-neutral factors in setting the starting salaries of all the relevant regional managers. *See* Def.'s Reply at 24, 26. Heise further asserts that Canon's vice president of HR Nelson Remetz and company president Tom Pike were the final decision-makers with respect to starting salaries. Canon makes no response to Heise's argument on this point; in its reply brief, Canon merely refers to its previously discussed Equal Pay Act arguments and asserts that the Title VII unequal pay claim fails for the additional reason that Heise has not presented evidence of discriminatory intent. The

Court therefore concludes that Canon has abandoned this first line of argument.

Heise contends that a reasonable factfinder could infer discriminatory intent from the same evidence already discussed in the context of her Title VII discriminatory discharge claim. As previously noted, this evidence includes the following: (1) Kowalczuk once called Heise a "silly girl," (2) Kowalczuk expressed concern to Heise about a woman traveling alone, (3) Kowalczuk promoted Lanera despite his documented history of sexually harassing female employees, (4) Canon transferred Verley's and Peck's worst-performing branches to Heise's region in 2012, (5) Canon denied Heise a merit increase in 2012, (6) Canon passed Heise over for promotions and paid her less than her male colleagues on numerous occasions, and (7) Canon accommodated several men whose jobs were in jeopardy either by finding them another position within the company or giving them advance notice of their termination, but did not do the same for women. Additionally, Kowalczuk assured Heise that her offer of $140,000 was "above the medium [sic]" when the median salary for the relevant pay band was actually $172,055 and he knew that both Peck's and Verley's salaries were significantly higher than Heise's. Def.'s SOF, Ex. T.

The above evidence was not enough to permit the inference that Heise's sex caused her discharge, due to the overwhelming evidence that Heise was terminated as the result of a legitimate restructuring decision. In this context, however, in the absence of a similarly compelling explanation for the pay disparities, a reasonable factfinder viewing the evidence in the light most favorable to Heise could infer that Canon intentionally paid Heise less than several of the male regional managers because she is a woman. The Court therefore denies Canon's motion for summary judgment on

Heise's Title VII unequal pay claim.

## Conclusion

For the foregoing reasons, the Court grants Canon's motion for summary judgment on Heise's retaliation claims (counts 3, 4, and 6) and the Title VII discriminatory discharge claim (count 5), but denies summary judgment with respect to the state and federal Equal Pay Act and Title VII compensation claims (counts 1, 2, and 5) [dkt. no. 130]. The Court denies Heise's cross-motion for summary judgment in its entirety [dkt. no. 135]. The case is set for a status hearing on July 31, 2018 at 8:30 a.m. for the purpose of setting a trial date and discussing the possibility of settlement.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 23, 2018